Edward W. MORGAN, Appellant,

v.

DISTRICT OF COLUMBIA, Appellee.

Robert ALPERN, Appellant,

v.

DISTRICT OF COLUMBIA, Appellee.

George H. WOODARD, Appellant,

v.

DISTRICT OF COLUMBIA, Appellee.

John T. SHIEL, Appellant,

v.

DISTRICT OF COLUMBIA, Appellee.

Nos. 82–80, 82–82, 82–97 and 82–129.

District of Columbia Court of Appeals.

Argued March 22, 1984.

Decided May 17, 1984.

Norman A. Townsend, Alexandria, Va., with whom Robert Alpern, pro se, Edward W. Morgan, pro se, and Palmer Singleton, Atlanta, Ga., were on the briefs, for appellants.

Marjorie Murphy, law student counsel (Palmer Singleton, Atlanta, Ga., Supervising Atty.), also entered an appearance for appellant Shiel.

Richard B. Nettler, Asst. Corp. Counsel, Washington, D.C., with whom Inez Smith Reid, Acting Corp. Counsel, Washington, D.C., at the time the brief was filed, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief, for appellee.

Before FERREN, PRYOR and TERRY, Associate Judges.

FERREN, Associate Judge:

In a bench trial, the court convicted appellants of unlawful assembly, D.C.Code § 22–1107 (1981), in the driveway of the Sheraton-Washington Hotel and sentenced each of them to thirty days' imprisonment, with execution of the sentences suspended. The trial court also imposed a one-year period of supervised probation on each appellant, conditioned on twenty-five hours of community service.

Appellants present several grounds for appeal: (1) D.C.Code § 22–1107 (1981) does not make unlawful the act of sitting in the driveway of a private building; (2) they did not act under circumstances likely to cause a breach of the peace, as required under case law construing the statute; (3) the trial court erred in excluding evidence proffered to establish a defense under international law; and (4) appellants did not have the state of mind required for violation of § 22–1107. We perceive no merit in these contentions and thus affirm the convictions.

## I.

On the early evening of September 16, 1981, a group of 130 to 150 persons participated in a demonstration outside the Sheraton-Washington Hotel where the Air Force Association was holding a convention. The group began picketing on the public sidewalk outside the hotel grounds, but soon some of the demonstrators, including appellants, moved into the hotel driveway. They sought to enter the hotel to give sacramental bread to the participants in the convention and to discuss with them the undesirable effects of nuclear weapons. As the protesters began walking up the driveway, they were stopped by police, who had erected police lines in the driveway. Police and hotel officials made several announcements over a bullhorn telling the protesters that they were on private property and asking them to leave the driveway. The demon-

strators did not do so; some of them sat down, blocking all but two feet of the entrance driveway and the entire width of the exit driveway. Approximately 50 of them, including appellants, were arrested.

## II.

The first portion of D.C.Code § 22–1107 (1981), the so-called "unlawful assembly" or "incommoding" statute, provides:

It shall not be lawful ... to congregate and assemble in any street, avenue, alley, road, or highway, or in or around any public building or inclosure, or any park or reservation, or at the entrance of any private building or inclosure, and engage in loud and boisterous talking or other disorderly conduct, or to insult or make rude or obscene gestures or comments or observations on persons passing by, or in their hearing, or to crowd, obstruct or incommode, the free use of any such street, avenue, alley, road, highway, or any of the foot pavements thereof, or the free entrance into any public or private building or inclosure; .... [Emphasis added.]

Appellants, when arrested, were inside a private inclosure on a private driveway leading to the door of a private building. Appellants Morgan and Woodard [1] contend that the statute does not apply to them because they were not "at the entrance" of a private building or inclosure. They point out that the statute distinguishes between public and private locations, prohibiting assembly "in or around" public buildings or inclosures but only "at the entrance" of private buildings or inclosures.

■ Assemblages of unwelcome persons on private property are commonly charged under the unlawful entry statute, D.C.Code § 22–3102 (1981), which requires a request to leave before it can be enforced. In contrast, § 22–1107 of the incommoding statute requires no such warning and reaches the situation in which the entrance

to a private location is blocked, but the unlawful entry statute is not violated because the persons blocking the entrance are standing on public property. The distinction between public and private locations in § 22–1107, therefore, can be explained primarily as an attempt to prohibit conduct blocking private property not covered by the unlawful entry statute. Arguably, it would follow that the incommoding statute does not cover assemblages of persons within private property if, as here, they block neither the entrance to the property nor the doorway to any building. However, in the absence of any legislative history confining the reach of § 22–1107 in that way, we must apply the plain language of the statute. See Peoples Drug Stores, Inc. v. District of Columbia, 470 A.2d 751 (D.C.1983) (en banc). We cannot say as a matter of law that the driveway is not part of the "entrance" to the building. The trial court's finding that the driveway was part of the building's entrance is supported by the record, for the hotel's chief of security testified that most of the participants in the convention arrived by automobile and needed to use the driveway to reach the hotel.

## III.

Appellants Morgan and Woodard argue that they did not act "under circumstances likely to cause a breach of the peace" and thus that, under Adams v. United States, 256 A.2d 563 (D.C.1969), they committed no § 22–1107 offense.

In Adams, supra, this court held that a person could not be charged with incommoding the free use of a public street unless the information alleged that "the act was done under circumstances which threaten a breach of the peace." Id. at 565. In doing so, we relied on Williams v. District of Columbia, 136 U.S.App.D.C. 56, 419 F.2d 638 (1969), where appellant was charged under the second portion of § 22–

---

[1]. While all appellants join in the brief raising this issue, we note that appellants Shiel and Alpern failed to move for judgment of acquittal at trial and therefore are precluded from questioning the sufficiency of the evidence on appeal.

1107 prohibiting use of "profane language or indecent or obscene words, ... in any street ...." The federal circuit court of appeals held that this provision would violate the First Amendment unless construed "to require an additional element that the language be spoken in circumstances which threaten a breach of the peace." *Id.* at 64, 419 F.2d at 646. The *Adams* court accordingly applied this requirement under the first portion of the statute (quoted in Part II *supra*) to unlawful assembly on a public street. The question here is whether the requirement must also be added to justify prosecution for unlawful assembly on private property.

■ As the court's analysis in *Adams, supra*, makes clear, the added requirement of a threat of breach of the peace was necessary to avoid infringing on the First Amendment freedom of assembly. Because, however, there is ordinarily no such freedom to assemble on private property,[2] and because the statutory language does not require a threat of breach of the peace for conviction, that requirement is not applicable under § 22–1107 to actions on private property, such as those with which appellants were charged.

## IV.

■ All appellants argue that the trial court erred in refusing to admit evidence proffered to show that their conduct was privileged under international law and, as a consequence, was not subject to criminal sanctions under local law. *See The Paquete Habana,* 175 U.S. 677, 20 S.Ct. 290, 44 L.Ed. 320 (1900). Assuming, without deciding, that such a defense under some circumstances would be available, we nonetheless conclude that the most generous

interpretation of appellants' proffer would not establish the defense here.

Appellants' argument depends on whether the activities inside the hotel were illegal under international law. Without such a showing, appellants would have no basis for claiming they were required or privileged to intervene. Appellants offered to show that the convention had the purpose of "promot[ing] nuclear weaponry and solidify[ing] the place of the military industrial complex within American society" and of "promot[ing] continued and increased reliance on nuclear weaponry." They characterized the convention as a "wholesale marketing of military hardware, nuclear and otherwise" at which "arms manufacturers, military leaders and Government officials met ... to exchange information about military technology." The authority on which they rely for the proposition that these activities were contrary to international law is the Charter of the International Military Tribunal, Aug. 8, 1945, 59 Stat. 1544, which provides that "planning, preparation, initiation or waging a war of aggression" is unlawful.

There are two difficulties with saying that the Air Force Association convention violated this provision. First, private parties, such as the arms manufacturers at the convention, cannot plan, prepare for, initiate, or wage war. Wars (except civil wars) are fought between sovereign governments. Military and government personnel attended the convention, but appellants did not offer to prove that these personnel did so in order to purchase weapons on behalf of the government or to plan war. Rather, appellants suggest only that government personnel "met [with arms manufacturers] to exchange information about military technology." Such an exchange of infor-

---

**2.** First Amendment concerns may be raised where restricting access to private property will effectively deprive the group of a place to assemble or prevent them from reaching a particular audience. *See Marsh v. Alabama,* 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946); *Schneider v. State,* 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939). The trial court found, and we agree,

that the protesters here had open to them other methods by which they could convey their message without contravening the statute. *See Lloyd Corp. v. Tanner,* 407 U.S. 551, 566–67 & n. 12, 92 S.Ct. 2219, 2227–28 & n. 12, 33 L.Ed.2d 131 (1972) (distribution of handbills in shopping center not protected where surrounding public streets provide alternative forum).

mation does not rise to the level of preparation for war.

Second, the Charter does not outlaw all wars, only wars of aggression—wars initiated to gain territory or other advantages, as opposed to wars fought to defend territory or other rights. The term therefore refers to the purpose for which a war is fought, rather than to the nature of the weapons used. Although appellants hinted at the possibility of showing that some nuclear weapons are useful only for offensive purposes, they did not offer to prove it and to show that some purely offensive weapons were on display. Their memorandum to the trial court alleged only that nuclear weapons are per se "aggressive," pointing to the catastrophic effects of such weapons. Appellants, therefore, did not sufficiently come to grips with the possibility that the intended function of the weapons on display was the commonly-stated purpose of deterring nuclear aggression by other sovereigns.

We conclude that appellants' proffer was inadequate to raise a defense under international law. Accordingly, the trial court did not err in refusing to admit the proffered evidence.

### V.

Appellants Morgan and Woodard present a number of arguments to the effect that they did not have the state of mind required for a violation of § 22–1107.

Appellants first claim that they did not intend the consequences of their actions, *i.e.,* the blocking of the driveway. In effect, therefore, they assert they cannot be convicted without that specific intent. In *Hunter v. District of Columbia,* 47 App. D.C. 406 (1918), the court made clear that the common-law requirement of specific in-

tent ("unlawful purpose") for the crime of unlawful assembly has been replaced under § 22–1107 by the requirement of committing "one of the acts forbidden by the statute." *Id.* at 409. Appellants' specific intent argument, therefore, has no merit.

■ That does not dispose of the matter, however, for according to *Morissette v. United States,* 342 U.S. 246, 251–52, 72 S.Ct. 240, 243–44, 96 L.Ed. 288 (1982), intent is an element of all crimes derived from the common law. Unlawful assembly is such a crime. *Hunter, supra,* 47 App. D.C. at 408. Proof of general criminal intent is therefore required for a conviction under § 22–1107. While general intent is frequently defined as the intent to do the prohibited act, it also requires the absence of an exculpatory state of mind (*e.g.,* mental disease, reasonable mistake of fact). R. PERKINS & R. BOYCE, CRIMINAL LAW 831–32 (3d ed. 1982).

■ Appellants initially argue that they did not intend to do any act prohibited by § 22–1107; their stopping in the driveway was "wholly unintended" and "resulted from appellants being stopped from entering the hotel by the police, and from being refused permission to pass the police lines ...." Appellants fail to focus on their intent at the relevant point in time. The fact that they initially intended to enter the hotel does not preclude the possibility that, once stopped by police, they intended to remain in the driveway rather than to leave as instructed. Given the uncontradicted testimony that the police made several announcements asking them to leave, but that they failed to do so, the evidence amply supports the finding that they intended to remain in the driveway.[3]

---

**3.** Although the driveway was first blocked when police set up barricades to prevent the demonstrators from proceeding up the driveway to the hotel, resulting in an obstruction before appellants sat down, it is reasonable to infer that, had appellants left the driveway when instructed to do so, the police barricades would have been removed. The evidence therefore supports a finding that appellants' remaining in the driveway caused the continued obstruction. It is also important to note that the barricades were initially set up as a foreseeable consequence of appellants' conduct in attempting to enter the hotel. The responsibility for the blocking of the driveway, therefore, at all times was appellants'.

Appellants next argue that the trial court erred in refusing to admit evidence showing they had an exculpatory state of mind, *i.e.*, their "intent to avert what they believed were international crimes." Essentially, they contend that, because they had a good faith belief—even if erroneous—that their actions were justified under international law, which was paramount to local law, they did not have the general intent required for conviction under § 22–1107. They are mistaken.

In *Gaetano v. United States*, 406 A.2d 1291 (D.C.1979), this court acknowledged, with reference to the unlawful entry statute, D.C.Code § 22–3102 (1981), the validity of the "bona fide belief" defense, *i.e.*, "a reasonable belief in an individual's right to remain on property not owned or possessed by that individual." 406 A.2d at 1294; *accord Leiss v. United States*, 364 A.2d 803, 809 (D.C.1976), *cert. denied*, 430 U.S. 970, 97 S.Ct. 1654, 52 L.Ed.2d 362 (1977); *Jackson v. United States*, 357 A.2d 409, 411 (D.C.1976); *Smith v. United States*, 281 A.2d 438, 439–40 (D.C.1971). However, in this context, the belief must be based on a reasonable mistake of fact, or on a reasonable mistake as to a non-penal property law which, if not a mistake, would justify remaining on the property.

> There must be some evidence that, for example, the individual had no reason to know that he was trespassing on the rights of others. Perhaps the individual could reasonably believe that he had title or a possessory interest in the land, or that the land was publicly owned. Perhaps he could believe that he was invited onto the land.

*Gaetano, supra*, 406 A.2d at 1294.[4]

Here, appellants were mistaken as to the sufficiency of a perceived legal defense under a law they otherwise intended to violate. More specifically, they believed that the convention activities contravened the Charter of the International Military Tribunal, *supra*, and that accordingly they were privileged or required under international law—and thus under local law—to violate the unlawful assembly statute, in order to prevent the greater wrong. Given the inadequacy of their international law proffer, *see* Part IV *supra*, admission of the proffered evidence at best could have shown that their belief about the sufficiency of their international law defense—while presumably held in good faith—was mistaken.

■ Appellants' argument, therefore, can prevail only if their beliefs were based on a reasonable mistake of fact or of non-penal law. General intent is not negated by a mistaken belief about the applicability of a penal law. R. Perkins & R. Boyce, *supra*, at 1029–30 (generally discussing ignorance or mistake of law).

■ Appellants proffer no mistake of fact, only a mistake of law: that they reasonably believed the convention activities violated the international Charter. That Charter, however, is properly characterized as a penal law; the section appellants apply to the Air Force Association convention is entitled "Crimes Against Peace." Thus, their mistake of law is no defense. The "bona fide belief" defense was not meant to excuse intended acts, based on an erroneous belief they are legally defensible under penal laws, any more than it was intended to "exonerate individuals who believe they have a right, or even a duty, to violate the law in order to effect a moral, social or political purpose." *Gaetano, supra*, 406 A.2d at 1294.

We conclude that the trial court's refusal to admit the proffered evidence to show appellants' state of mind was not error, since the proffer was not exculpatory.

4. The concepts of "mistake of fact" and "mistake of non-penal law" are often very close to one another. For example, trespassers may be excused for lack of criminal intent because they mistakenly but reasonably believed they had entered on to someone else's property under a prescriptive easement. The mistake may be as to the actual length of time that adverse use has continued (mistake of fact) or as to the time required to establish a prescriptive easement (mistake of law). *See* R. Perkins & R. Boyce, *supra*, at 1031, 1044–45.

And, as explained earlier, the evidence otherwise was sufficient to show that appellants had the required general intent to take actions forbidden under § 22–1107.

*Affirmed.*